**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

JOSE PINEDA,          )
    Plaintiff,      )
             )
    v.              )
             )   Civil Action No. _____
UNITED STATES,        )
    Defendant.      )
             )
             )
             )

## INTRODUCTION

1.    This case arises from the unlawful and excessive enforcement tactics conducted by U.S. Immigration and Customs Enforcement ("ICE") officers against Plaintiff Jose Pineda, a 62-year-old husband and father.

2.    Early in the morning of May 27, 2025, Mr. Pineda was driving to a worksite with his co-workers when multiple unmarked vehicles and several ICE officers on foot stopped and surrounded him. One officer approached Mr. Pineda's window and demanded identification. Mr. Pineda complied, immediately producing his valid driver's license. Then, without justification, the ICE officer interrogated him about his place of birth. Frightened, Mr. Pineda answered truthfully: he was born in El Salvador, and he was lawfully authorized to be in the United States. Believing that his lawful immigration status would quickly be verified, Mr. Pineda expected the query to be brief, but the encounter escalated.

3.    After learning that Mr. Pineda was foreign-born, an ICE officer told him that people not born in this country have no rights.

4.    The aggressive nature of the questioning made it clear to Mr. Pineda that he was not being judged based on any evidence of unlawful conduct, but rather on his identity, race,

1

ethnicity, and/or national origin. Rather than reviewing Mr. Pineda's documentation or verifying his lawful status, the officer aggressively removed Mr. Pineda from the vehicle, forcibly twisted his arms behind his back, and handcuffed him. The ICE officers then, without consent, searched him and the vehicle, and seized private property, including documentation establishing Mr. Pineda's lawful immigration status.

5.      Even after obtaining the documents that confirmed Mr. Pineda's lawful immigration status, the ICE officers chose not to release him. Instead, the ICE officers seized and detained Mr. Pineda further. They transported him in shackles to an immigration detention facility, where he remained captive under cruel and inhumane conditions.

6.      When Mr. Pineda was eventually released, ICE failed to return his personal property, including approximately $600 in cash that had been seized from his person. The money remains unreturned to this day.

7.      At no point did ICE meaningfully investigate or acknowledge that the documentation in its possession confirmed Mr. Pineda had the right to be present in the United States. Instead, the ICE officers warped what should have been a minutes-long inquiry into a prolonged and unlawful detention driven by discriminatory animus towards Latino immigrants.

8.      Mr. Pineda has suffered devastating and ongoing physical and emotional harm that has impacted all aspects of his life. Mr. Pineda brings this action to seek accountability for these violent and traumatizing tortious acts of the ICE officers and to address the harms inflicted upon him.

9.      Defendant is liable for this conduct under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671 *et seq.*

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b) because this is a civil action against the United States for money damages, personal injury, and property loss caused by the negligent and wrongful acts and omissions of employees of the United States acting within the scope of their office or employment.

11.      Venue is proper in the District of Massachusetts under 28 U.S.C. §§ 1391(b)(2) and 1402(b) because the acts and omissions complained of occurred in Massachusetts and Mr. Pineda resides in Massachusetts.

12.      This Court has personal jurisdiction over Defendant under 28 U.S.C. § 1391(e).

13.      On August 6, 2025, Mr. Pineda filed an administrative complaint with the U.S. Department of Homeland Security ("DHS") and ICE pursuant to the FTCA's presentment requirements. The government failed to respond to the complaint within the six-month statutory period. Accordingly, Mr. Pineda has satisfied the administrative exhaustion requirement under 28 U.S.C. § 2675(a).

## PARTIES

14.      Mr. Pineda is a 62-year-old Salvadoran man who resides with his wife and 13-year-old daughter in East Boston, Massachusetts. He is a full-time landscaper and is the primary wage earner for his family.

15.      Mr. Pineda came to the United States more than thirty years ago, fleeing the violence and instability that followed the Salvadoran Civil War. For decades, he has held humanitarian immigration protections that authorize him to live and work in the United States. Mr. Pineda has no criminal record.

16.     At the time of his arrest and continuously thereafter, Mr. Pineda has been a recipient of Temporary Protected Status ("TPS"). *See* 8 U.S.C. § 1254a. Federal immigration officers, including ICE, "shall not remove [a TPS recipient] from the United States during the period in which such status is in effect." *Id.* § 1254a(a)(1)(A). TPS recipients are "authorize[d] . . . to engage in employment in the United States." *Id.* § 1254a(a)(1)(B).

17.     Additionally, Mr. Pineda had a pending asylum petition and was granted a T-Visa.[1]

18.     Defendant United States, acting through DHS and ICE, is the proper defendant for FTCA claims under 28 U.S.C. § 1346(b).

## FACTS

### *ICE's Unlawful Arrest and Abduction of Mr. Pineda*

19.     On the early morning of May 27, 2025, Mr. Pineda followed his daily routine and drove to work. Upon arriving, Mr. Pineda, along with two co-workers, drove the company-owned vehicle to their first landscaping job site of the day.

20.     The company vehicle was a truck bearing the landscaping company's logo and carrying mulch-like material in its truck bed.

21.     All three passengers of the vehicle were Latino men.

22.     At approximately 7:00 A.M., while stopped at a traffic light in Weymouth, Massachusetts, three unmarked vehicles activated police lights and sirens signaling Mr. Pineda to pull over.

23.     Approximately five armed officers dressed in plain clothes and wearing ICE vests immediately surrounded the vehicle on foot. The positioning of the vehicles and the armed ICE officers effectively blocked Mr. Pineda and the passengers from leaving the area.

---

[1] *See* 22 U.S.C. § 7105(b)(1)(E)(i)(II)(aa).

24.     Two ICE officers approached the driver's side of the vehicle, while three other officers approached the passenger side. One of the officers at the driver's window demanded to see Mr. Pineda's identification. Mr. Pineda immediately provided the ICE officer with his valid driver's license.

25.     Then, that same ICE officer interrogated Mr. Pineda about his place of birth. Mr. Pineda truthfully responded that he was from El Salvador and explained that he was a TPS recipient, which made him legally authorized to be in the United States.

26.     Instead of verifying Mr. Pineda's TPS status and letting him go, the ICE officer told Mr. Pineda, first in English and then in Spanish: If you're not born here, you have no rights.

27.     Consistent with his lawful humanitarian status and work authorization, Mr. Pineda offered to present both his Employment Authorization Document ("EAD") and his Social Security card to the officer. However, the ICE officer ignored Mr. Pineda and instead ordered him to exit the vehicle immediately.

28.     Fearing potential violence, Mr. Pineda complied. He kept his hands empty and visible throughout the encounter.

29.     As soon as Mr. Pineda stepped out of the vehicle, an ICE officer forcibly pulled Mr. Pineda's arms behind his back and applied handcuffs so tightly that he temporarily lost sensation in his hands.

30.     Mr. Pineda requested to contact his employer to secure the company vehicle, but the officers denied his request, leaving the vehicle unattended on the street.

31.     Without a warrant or consent, the ICE officers searched Mr. Pineda and seized his belongings, including his wallet, driver's license, Social Security card, EAD, credit card, and cash.

32.     Despite Mr. Pineda possessing documentation proving his lawful status in the United States, the ICE officers escalated their illegal detention instead of releasing him. The ICE officers forcibly transferred Mr. Pineda to a van, replacing his tightly bound handcuffs with front-facing handcuffs and chains, shackling both his wrists and ankles.

33.     Mr. Pineda remained confined in the van for approximately forty minutes without air conditioning while the ICE officers continued loading detainees, all Latino men, until the van was full.

34.     Once full, all the detainees, including Mr. Pineda, were transported for approximately one hour to ICE's Burlington field office.

35.     In those moments, despite his lawful status, Mr. Pineda feared detention and deportation. He worried for his daughter and wife, who had no way of knowing his whereabouts or how long he would be detained.

36.     At no point did the ICE officers provide or obtain a warrant authorizing Mr. Pineda's arrest.

### *Plaintiff Endured Unlawful and Inhumane Conditions*

37.     Between approximately 10:00 A.M. and 11:00 A.M., Mr. Pineda arrived at ICE's Burlington field office.

38.     Upon arrival, without consent, ICE officers subjected Mr. Pineda to a second search. During the second search, the officers removed and confiscated additional items, including Mr. Pineda's shoelaces, the drawstring from his hoodie, and additional money, bringing the total cash confiscated to $600.

39.     Conditions at the Burlington facility were devastating and inhumane. The facility was not designed to accommodate the large number of people ICE continuously hauled there, resulting in severe overcrowding.[2]

40.     Mr. Pineda was held in a compact cell with more than 40 people and, at times, up to 60. The cell became so congested that there was rarely an opportunity to sit or lie down, forcing Mr. Pineda to remain standing for most of his detention.

41.     The cell had no exterior windows, with only a one-way glass window on the interior wall. It contained a small sink and a single shared toilet, offering no privacy for detainees. No soap or toilet paper was provided, forcing detainees to use the facilities under unsanitary and degrading conditions. Detainees were not provided with toothbrushes, a clean change of clothes, or access to showers.

42.     Later that afternoon, Mr. Pineda was moved to a second cell, which was similarly overcrowded, with ICE placing people in the cell or removing them throughout the night.

43.     A bright fluorescent light remained on at all times, day and night, preventing meaningful rest or sleep. Temperatures fluctuated dramatically, becoming extremely hot during the day and extremely cold at night. Some detainees were only given an aluminum blanket for warmth.

44.     Throughout his detention, Mr. Pineda continued to worry about his family. On his first day of detainment, between 4:00 P.M. and 5:00 P.M., Mr. Pineda requested to use the phone to call his attorney and wife. However, the ICE officers limited his phone access, only allowing him to make a two-minute phone call. He called his wife, who then contacted his attorney.

---

[2] *See* Miriam Wasser, *Inside the Burlington Office ICE Has Used to Detain Immigrants*, WBUR (July 18, 2025), https://www.wbur.org/news/2025/07/18/massachusetts-immigration-ice-burlington-field-office-unsanitary-conditions-diaz-martinez.

45.     Throughout his detainment, food and water were inadequate and limited. He only received two bottles of water each day. On the first day, around 8:00 P.M., he was only given a sour, inedible oat pudding to eat. On the second day, around 11:00 A.M., Mr. Pineda was given a cup of pureed vegetables resembling baby food. It smelled foul and rotten. He did not eat it for fear of becoming ill, as he suffers from gastritis. Later that day, between 6:00 P.M. and 8:00 P.M., he was given a small burrito.

46.     Due to the lack of adequate food and water, Mr. Pineda's gastritis flared during his detention. He was never asked about any medical conditions, nor was he given any accommodations for his health condition.

47.     On May 28, 2025, at approximately 7:30 P.M., ICE finally released Mr. Pineda.

48.     Upon his release, ICE officers failed to return the $600 that had been seized from Mr. Pineda. When he inquired about the money, the officers stated they could not locate it.

49.     Despite lacking a legal basis for Mr. Pineda's arrest and detention, ICE officers attempted to retroactively justify Mr. Pineda's unlawful arrest and detention by improperly issuing him a Notice to Appear ("NTA") before an immigration judge.

50.     The NTA falsely alleged that Mr. Pineda was unlawfully present and purported to initiate removal proceedings, scheduling a hearing in immigration court on July 10, 2025, in Chelmsford, Massachusetts. The bogus proceedings and sham hearing were ultimately canceled.

### *The Harmful Effect of the Government's Unlawful and Unconstitutional Conduct*

51.     As a result of the unlawful arrest, detention, and mistreatment by Defendant, Mr. Pineda has suffered and continues to suffer physical, emotional, and financial harm.

52.     Being racially profiled, forcibly stopped, handcuffed, transported in chains, and confined in overcrowded and degrading conditions for a prolonged period caused Mr. Pineda significant emotional distress and trauma.

53.     Since this incident, Mr. Pineda experiences persistent sleep disturbances, including insomnia and recurring nightmares related to his arrest and confinement by the Defendant. He often wakes suddenly in a state of fear and distress, sometimes shouting or moving violently in his sleep. The severity of these night terrors has become so significant that Mr. Pineda and his wife are no longer able to share a bed out of concern that his thrashing during sleep may inadvertently injure her. He has also experienced sleepwalking and frequent headaches, resulting from stress, exhaustion, and the trauma of the incident.

54.     Also, one of the most painful consequences of this incident for Mr. Pineda has been its impact on his 13-year-old daughter. She continues to struggle emotionally with the memory of the fear and anguish she endured when ICE abducted and disappeared her father without a trace, leaving the family with no information as to when—if ever—he would return home. As a father, Mr. Pineda is distraught from having to watch his daughter suffer emotionally because of an incident he could not protect her from.

55.     Moreover, Mr. Pineda continues to experience daily anxiety stemming from the traumatic encounter with ICE. The incident has left him hypervigilant and fearful when he sees unmarked vehicles or law enforcement officers. At times, he pulls over while driving because he believes he is being followed.

56.     Mr. Pineda also experiences a sense of claustrophobia triggered by memories of the overcrowded detention facility.

57.     Additionally, Mr. Pineda suffers from memory loss and difficulty concentrating—symptoms and health conditions that he did not experience before this incident. At work, he often forgets tools or tasks that he previously managed without difficulty, forcing him to make repeated trips to retrieve equipment or complete routine responsibilities.

58.     Also, Mr. Pineda has suffered physical harm as a result of this incident. He continues to experience persistent back pain caused by being tightly restrained, transported in chains, and forced to stand for extended periods in overcrowded ICE detention conditions.

59.     The lack of proper nourishment during his confinement by the Defendant worsened Mr. Pineda's gastritis, causing increased gastric irritation and inflammation. Since the incident, he has experienced a decreased appetite and recurring symptoms, including throat inflammation and difficulty swallowing after eating or drinking certain foods. These symptoms sometimes force him to stop working because he feels nauseated or ill.

60.     Defendant's actions have also caused financial hardship for Mr. Pineda's family. ICE failed to return the $600 in cash it seized from him, disrupting the family's ability to pay rent that month.

61.     Because Mr. Pineda was confined by the Defendant for multiple days and unable to report to work, he also lost wages.

62.     Mr. Pineda cannot afford healthcare to address the harms caused by ICE's conduct. This has left him carrying the weight of a lasting injury—both physical and emotional—without the medical care or treatment essential for healing.

### ICE's Rampant Practice of Racial Profiling and Unconstitutional Arrests

63.     Since January 2025, ICE has significantly increased its immigration enforcement efforts nationwide. Across the country, ICE has arrested individuals based solely on perceived race,

10

ethnicity, and national origin without verifying their actual immigration status.[3] While ICE claims to target "egregious criminal alien offenders, including transnational criminal organizations,"[4] its dragnet, quota-driven,[5] ask-questions-later approach has led to the unlawful and baseless arrest and detention of United States citizens,[6] legal residents,[7] and noncitizens alike.

64.     In stark contrast to past administrations' immigration enforcement practices, ICE's current practices have sharply increased community or "street" arrests, usually involving people like Mr. Pineda without prior criminal records.[8]

65.     Moreover, in analyzing ICE's arrest data, a clear pattern emerges: Latino immigrants appear to be disproportionately represented in ICE arrests.[9] From the start of the current administration through the end of July 2025, ICE executed over 16,000 street arrests, approximately 90% of which involved Latino immigrants.[10]

---

[3] Mellissa Hellman, *'It's like they're hunting': US citizens and legal residents report increase in racial profiling by ICE,* THE GUARDIAN (Jan. 22, 2026), https://www.theguardian.com/us-news/2026/jan/22/us-citizens-racial-profiling-ice.

[4] *ICE, federal partners arrest more than 1,400 illegal aliens in Massachusetts during Patriot 2.0, including murderers, rapists, drug traffickers, child sex predators and members of violent transnational criminal gangs: Enforcement operation targeted criminal alien offenders during the month of September*, U.S. Immigration and Customs Enforcement Press Release (Oct. 16, 2025), https://www.ice.gov/news/releases/ice-federal-partners-arrest-more-1400-illegal-aliens-massachusetts-during-patriot-20.

[5] José Olivares, *Trump Administration Sets Quota to Arrest 3,000 People a Day in Anti-immigration Agenda*, THE GUARDIAN (May 29, 2025), https://www.theguardian.com/us-news/2025/may/29/trump-ice-arrest-quota.

[6] Jazmin Ulloa, et al., *'I'm From Here!': U.S. Citizens Are Ending Up in Trump's Dragnet*, N.Y. TIMES (Sept. 29, 2025), https://www.nytimes.com/2025/09/29/us/trump-immigration-agents-us-citizens.html.

[7] Mercedes Paris & Solangi Sosa, *Worker Arrested by ICE in Lynn, Later Released, Says Agents Beat Him in Cemetery*, NBC BOSTON (June 6, 2025), https://www.nbcboston.com/news/local/worker-arrested-by-ice-in-lynn-released-a-day-later-says-he-was-beaten-in-custody/3733701/.

[8] David J. Bier, *One in Five ICE Arrests Are Latinos on the Streets with No Criminal Past or Removal Order*, CATO Inst. (Aug. 5, 2025), https://www.cato.org/blog/1/5-ice-arrests-are-latinos-streets-no-criminal-past-or-removal-order (finding that "ICE agents are deliberately targeting workers in heavily Latino jobs and neighborhoods").

[9] *Id.*; *see also* New York Immigration Coalition, *Unmasking ICE's Anti-Latino Practices – and What New York City Can Expect*, 3 (Dec. 2025), https://www.nyic.org/wp-content/uploads/2025/12/NYC-Area-ICE-Arrests-v4-JV-12.8.25.pdf.

[10] Bier, *supra* note 8; *see also* Jonathan Ong et al., *Latino ICE Arrests Surge Under Trump*, UCLA (Oct. 2025), https://knowledge.luskin.ucla.edu/wp-content/uploads/2025/10/Unseen_Latino-Ice-Arrests-Surge-Under-Trump_20251027.pdf (finding that "non-Latinos accounted for less than 10% of ICE arrests").

66.    At the time that Mr. Pineda was illegally arrested and detained, ICE launched what it dubbed "Operation Patriot" in Massachusetts.[11]

67.    Acting ICE Director Todd Lyons touted that Operation Patriot removed dangerous criminals from Massachusetts.[12] In reality, according to Massachusetts officials, 46% of those detained during Operation Patriot had no criminal charges or convictions.[13]

68.    ICE's Boston Field Office Director, Patricia Hyde, claimed that all 1,461 people arrested during Operation Patriot lacked lawful immigration status.[14] While ICE has not released sufficient information to probe the veracity of that statement, Defendant's unlawful arrest and detention of Mr. Pineda—despite his lawful status—casts serious doubt on its accuracy.

69.    The statute governing enforcement standards, 8 C.F.R. § 287.8, mandates that only officers who have successfully completed basic training may conduct enforcement activities.[15] It establishes an affirmative duty to ensure that ICE officers are trained. Despite this affirmative duty to train, ICE's training of its officers, including training concerning constitutional limits, is woefully inadequate.[16]

---

[11] Amy Gorel & Simón Rios, *ICE, U.S. Attorney say 1,500 arrested in Mass. during immigration enforcement in May*, WBUR (June 2, 2025), https://www.wbur.org/news/2025/06/02/massachusetts-federal-immigration-arrests.
[12] *Id.*
[13] Letter from Massachusetts Governor Maura Healy (Mar. 6, 2026), https://www.mass.gov/doc/letter-to-noem/download.
[14] Gorel, *supra* note 11.
[15] 8 C.F.R. § 287.8.
[16] *See, e.g.*, *Alfaro v. Mullin*, No. 26-CV-766, 2026 WL 734348, at *6 (E.D.N.Y. Mar. 16, 2026) (condemning ICE officers' "astonishing lack of awareness of their duties under the law," and the government "ignor[ing] the scores of decisions they have unsuccessfully litigated before this Court and others, without taking action to ensure their agents and agencies are not acting in contravention of the law"); Geoff Bennet, *Whistleblower Warns ICE Has Slashed Training for Recruits*, PBS News Hour (Feb. 26, 2026), https://www.pbs.org/newshour/show/whistleblower-warns-ice-has-slashed-training-for-recruits (reporting that ICE cut training classes including "classes on the fundamentals of the Constitution and the officers' duties within the structure of our legal system"). A sworn declaration from former ICE employee and whistleblower Ryan Schwank was filed by Plaintiffs' counsel in a separate action pending in this District. *See* Decl. of Ryan Schwank, *Greater Bos. Latino Network et al. v. Mullin et al.*, No. 26-CV-10472 (D. Mass. June 5, 2026), Dkt. 27-3. The declaration is available at: https://lawyersforcivilrights.org/wp-content/uploads/2026/06/Whistleblower-Declaration-2.pdf (describing ICE leadership's knowledge of and direction regarding officer training).

70.     Indeed, a former ICE employee testified to Congress that "ICE [] graduate[d] thousands of new officers who do not know their constitutional duty, do not know the limits of their authority, and who do not have the training to recognize an unlawful order."[17]

71.     Recently, ICE mandated additional training for its officers; in doing so, ICE indirectly acknowledged that the previous training offered to its officers was not sufficient, and they needed additional training.[18] The ongoing constitutional violations that ICE has committed across the country, including against Mr. Pineda, constitute evidence of inadequate training and corrective supervision.

72.     Defendant's mistreatment of Mr. Pineda bears out the dangers of ICE's institution-wide failure to train, supervise, and manage its officers.

### Legal Protections Against ICE's Abuse

73.     The Constitution stands as a safeguard against government overreach, protecting individuals from the Defendant's arbitrary and unlawful exercise of power. Together with applicable statutes and regulations, the law defines clear limits on law enforcement authority. Those limits are not optional. They create mandatory, non-discretionary obligations that ICE was required to follow but failed to comply with here. These protections include, among others, the guarantees secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments, as well as federal statutes and regulations governing ICE's conduct.

74.     "[I]mmigration stops and arrests [a]re subject to the same Fourth Amendment requirements that apply to other stops and arrests—reasonable suspicion for a brief stop, and

---

[17] Michael Kaplan & Camilo Montoya-Galvez, *ICE Whistleblower Warns New Recruits Are Receiving "Defective" Training*, CBS (Feb. 23, 2026), https://www.cbsnews.com/news/ice-whistleblower-new-recruits-receiving-defective-training/ (describing ICE training as "deficient, defective, and broken").

[18] Camilo Montoya-Galvez, *ICE Mandates Additional Training for New Hires After Backlash,* CBS (June 18, 2026), https://www.cbsnews.com/news/ice-training-new-hires-backlash/.

probable cause for any further arrest and detention." *Morales v. Chadbourne*, 793 F.3d 208, 215 (1st Cir. 2015).

75. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person, and the Fourth Amendment requires that seizure be reasonable." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) (internal quotation marks and citation omitted).

76. Arresting Mr. Pineda for a perceived immigration violation based on identity, race, ethnicity, and/or national origin is fundamentally incompatible with the Fourth Amendment's guarantee against unreasonable seizures. *Id.* at 885-86.

77. In this case, key elements of abuse of authority are present: the ICE officers unlawfully stopped a vehicle based solely on Mr. Pineda's identity, deliberately blocked and impeded Mr. Pineda's movement and egress, surrounded the vehicle while armed, wrongly claimed that Mr. Pineda had no rights, and illegally searched, arrested, and detained him.

78. Defendant's unlawful stop, illegal arrest, and unlawful detention of Mr. Pineda violated clearly established Massachusetts law and the Fourth Amendment. *Id.* at 885-86.

79. Federal immigration statutes, regulations, and policies reinforce these constitutional safeguards. Under 8 U.S.C. § 1357, immigration officers may only make a warrantless arrest if they have "reason to believe that the alien so arrested is in the United States in violation of any [immigration] law or regulation *and* is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2) (emphasis added). The "reason to believe" phrase in § 1357 is the equivalent of "probable cause." *Morales*, 793 F.3d at 216-17.

80. Similarly, ICE's own regulations codify how ICE officers should conduct themselves as they engage in enforcement activity, including the requirement to obtain a warrant

14

"except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." 8 C.F.R. § 287.8(c)(2)(ii).

81.     Defendant's regulations also require that ICE officers "[i]dentify himself or herself as an immigration officer" in a timely and adequate manner, 8 C.F.R. § 287.8(c)(2)(iii)(A). ICE officers are also required to use minimal force:

> A designated immigration officer shall *always* use the minimum non-deadly force necessary to accomplish the officer's mission and shall escalate to a higher level of non-deadly force only when such higher level of force is warranted by the actions, apparent intentions, and apparent capabilities of the suspect, prisoner, or assailant.

8 C.F.R. § 287.8(a)(1)(iii) (emphasis added).

82.     These requirements are further reinforced by DHS's Use of Force Policy, which limits ICE officers to "use force only when no reasonably effective, safe, and feasible alternative appears to exist," and only to the extent that the force used is "**objectively reasonable** in light of the facts and circumstances"[19] (emphasis in original). The policy also mandates that ICE officers cease using force once resistance ends or the situation has been brought under control.[20]

83.     The Fifth Amendment's Due Process Clause provides that government actors may not deprive any person of "life, liberty, or property, without due process of law." U.S. Const. amend. V.

84.     The U.S. Supreme Court has long recognized the centrality of bodily autonomy to these protections. Over a century ago, it affirmed that "[n]o right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and

---

[19] DHS, *Update to the Department Policy on the Use of Force*, at 2 (Feb. 6, 2023), https://www.dhs.gov/sites/default/files/2023-02/23_0206_s1_use-of-force-policy-update.pdf.
[20] *Id.*

unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891) (affirming the fundamental "right ... to be let alone"); *cf. Obergefell v. Hodges*, 576 U.S. 644, 663 (2015) (affirming the centrality of protecting "individual dignity and autonomy").

85.    Due process also forbids governmental "conduct that shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952) (finding that due process prevents efforts to "legalize force so brutal and so offensive to human dignity"); *see Parratt v. Taylor*, 451 U.S. 527, 545 (1981) (Blackmun, J., concurring) (abusive government actions "are, in and of themselves, antithetical to fundamental notions of due process") (citations omitted); *see also Fernandez v. Leonard*, 784 F.2d 1209, 1215-16 (1st Cir. 1986) (noting importance of preventing "abusive government conduct") (internal quotation marks and citations omitted); *United States v. Windsor*, 570 U.S. 744, 774 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws.").

86.    Mr. Pineda's unlawful arrest and detention resulted from ICE officers racially profiling him—conduct the U.S. Supreme Court has condemned as unconstitutional. *Whren v. United States*, 517 U.S. 806, 813 (1996) (the Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race"); *see also Brignoni-Ponce*, 422 U.S. at 885-86.

87.    Further, the Fifth and Eighth Amendments both require that, when the state restrains an individual's liberty, it must provide for his "basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *see also O'Brien v. Moriarty*, 489 F.2d 941, 944 (1st Cir. 1974) (noting the importance of "food, heat, sanitation, lighting or bedding"). "The duties owed under the Due Process Clause to those who are detained civilly are *at least as* extensive as those owed under the

16

Eighth Amendment to convicted inmates." *Gomes v. U.S. Dep't of Homeland Sec., Acting Sec'y*, 460 F. Supp. 3d 132, 145 (D.N.H. 2020) (emphasis in original); *see also Savino v. Souza*, 459 F. Supp. 3d 317, 320 (D. Mass. 2020) ("The Constitution dictates that the government reasonably safeguard those in its custody, for the power to incarcerate implies the duty to protect.").

88.     Consistent with the protections guaranteed by the Fifth and Eighth Amendments, ICE issued the Performance-Based National Detention Standards ("PBNDS"), which govern facilities holding those in ICE custody.[21] The PBNDS "are crafted to improve medical and mental health services, increase access to legal services and religious opportunities, improve communication with detainees with no or limited English proficiency, improve the process for reporting and responding to complaints, and increase recreation and visitation."[22] ICE failed to meet its own basic standards during Mr. Pineda's unlawful detention.

89.     Among other requirements, the PBNDS mandate that "[e]ach detainee shall be given an opportunity to shower and shall be issued clean clothing, bedding, towels, and personal hygiene items."[23] They further require that "[a]ll detainees shall be issued … at a minimum: 1. bedding: one mattress, one blanket and one pillow (additional blankets shall be issued, based on local indoor-outdoor temperatures); 2. linens: two sheets and one pillowcase; and 3. towel: one towel."[24] The standards also require that facilities provide "an adequate number of toilets" and that "[a]ll housing units with three or more detainees must have at least two toilets."[25]  During Mr. Pineda's unlawful detention, ICE never permitted him to shower or change his clothes. The room

---

[21] ICE, *Performance Based National Detention Standards 2011* (Revised 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.
[22] *Id.* at i.
[23] *Id.* at 49.
[24] *Id.* at 330.
[25] *Id.* at 329.

he was confined to was so compact that there was no space for bedding or toileting to meet ICE's basic standards.

90.     In addition, the PBNDS require that "[s]taff shall ensure sanitation, temperatures and humidity in hold rooms are maintained at acceptable and comfortable levels."[26] During his detention, ICE forced Mr. Pineda into a room that was unsanitary and had extreme temperature fluctuations throughout his confinement.

91.     The standards also protect detainees' access to counsel: "Detainees and their legal counsel shall be able to communicate effectively with each other...[and] Telephone access procedures shall foster legal access and confidential communications with attorneys."[27] During his confinement by ICE, Mr. Pineda was never afforded the opportunity to call his attorney directly.

92.     ICE's policies further provide that "[a]n individual may not be confined in a facility's hold room for more than 12 hours."[28] Nevertheless, Mr. Pineda was detained for approximately 48 hours at ICE's Burlington Field Office—a facility not designed for prolonged detention and intended to hold people only for a matter of a few hours.[29]

93.     While confined, Mr. Pineda was denied access to basic necessities, including adequate bedding, food, water, clothing, and hygiene. These deprivations contravene clearly established case law—*supra* ¶ 87—and amount to conditions of confinement that fall below the minimal standards of human decency. Thus, they violated Mr. Pineda's well-established constitutional rights and the statutory and regulatory protections governing his detention.

---

[26] *Id.* at 102.
[27] *Id.* at 385.
[28] *Id.* at 99.
[29] Alex Berger, *Town of Burlington Issues Formal Demand to Investigate ICE Facility*, Bos. Globe (June 26, 2025), https://www.bostonglobe.com/2025/06/26/metro/burlington-ice-facility-investigation-demand/; *see also* Letter from Sen. Elizabeth Warren et al. to Todd Lyons & Patricia Hyde (June 25, 2025), https://www.warren.senate.gov/wp-content/uploads/media/doc/warren_markey_delegation_letter_to_ice_on_burlington_holding_facility.pdf.

## CAUSES OF ACTION

## COUNT I

## False Imprisonment

## (FTCA, 28 U.S.C. §§ 2671–2680)

94.     Mr. Pineda repeats and realleges each of the preceding allegations as if fully set forth herein.

95.     Under Massachusetts law, the elements of false imprisonment are that the defendant imposed—"by force or threat"—an unlawful restraint on the freedom of movement. *Ortiz v. Hampden*, 16 Mass. App. Ct. 138, 140 (1983) (citation omitted). If a person is unjustifiably restrained of their liberty, this amounts to false imprisonment. *Coblyn v. Kennedy's, Inc.*, 359 Mass. 319, 321 (1971) (allowing tort action for false imprisonment); *see also Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9, 64-65 (D. Mass. 2024) (allowing false imprisonment claims to proceed).

96.     Defendant, through its officers and agents, intentionally restrained Mr. Pineda's freedom of movement by surrounding his vehicle, ordering him out of the vehicle, placing him in handcuffs, transporting him in restraints, and detaining him at the ICE Burlington field office for two days.

97.     The ICE officers restricted Mr. Pineda's freedom of movement without any legal or justifiable reason. Mr. Pineda was lawfully present in the United States and had official identification and immigration documentation in his possession confirming his lawful presence. Defendant lacked probable cause or any lawful basis to arrest or detain him.

19

98.     As a direct and proximate result of Defendant's actions, Mr. Pineda was unlawfully confined for approximately two days and suffered—and continues to suffer—from physical, emotional, psychological, and financial harm.

## COUNT II

### False Arrest

### (FTCA, 28 U.S.C. §§ 2671–2680)

99.     Mr. Pineda repeats and realleges each of the preceding allegations as if fully set forth herein.

100.     The elements of false arrest are "(1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the defendant had no privilege to cause the confinement." *Calero–Colon v. Betancourt–Lebron*, 68 F.3d 1, 3 n.6 (1st Cir. 1995) (citation omitted). Probable cause "is required for the arrest to be lawful." *Abubardar v. Gross*, 542 F. Supp. 3d 69, 77 (D. Mass. 2021) (allowing false arrest claims to proceed).

101.     To conduct a warrantless arrest, ICE officers must have "*reason to believe* that the alien so arrested is in the United States in violation of any [immigration] law or regulation *and* is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2) (emphasis added); *see also Coblyn*, 359 Mass. at 325 (holding that "reasonable grounds" and "probable cause" have "traditionally been accorded the same meaning").

102.     Here, Defendant, through its officers and agents, intentionally caused Mr. Pineda to be arrested by stopping his vehicle, ordering him out of the vehicle, cuffing his hands and feet, and placing him into ICE custody.

103.    Mr. Pineda was aware of his arrest and did not consent to it. He remains deeply affected by the traumatic impact of the unlawful arrest perpetrated by Defendant.

104.    The ICE officers had no reasonable basis or probable cause to believe that Mr. Pineda had violated any immigration laws because Mr. Pineda had—and still has—lawful humanitarian immigration status.

105.    During the May 27, 2025, encounter, he promptly presented a valid driver's license to ICE officers, explained his legal status, and offered immigration documentation. The ICE officers arrested Mr. Pineda and confiscated his property—including his federally-issued employment authorization document, which confirmed his lawful status.

106.    Defendant lacked lawful authority to arrest Mr. Pineda without a warrant. In addition to not having probable cause to establish that Mr. Pineda violated any immigration law, there were also no articulable facts to establish that Mr. Pineda was "likely to escape before a warrant [could] be obtained for his arrest." 8 U.S.C. § 1357(a)(2).

107.    Since 1994, Mr. Pineda has forged strong ties to the community. He is a longtime resident of East Boston, Massachusetts, where he lives with his wife and 13-year-old daughter. He has been working as a landscaper for about 10 years. His entire life is well established and depends on his remaining in the community.

108.    There were no exigent circumstances during the arrest to suggest that Mr. Pineda posed a flight risk or that obtaining a warrant was impracticable. On the contrary, Mr. Pineda was surrounded by multiple ICE vehicles and armed officers, leaving him with no opportunity to flee. Under these conditions, there was no factual or legal basis to bypass the warrant requirement.

109.    The ICE officers lacked particularized suspicion to justify stopping Mr. Pineda. They were not specifically seeking him, had no warrant for his arrest, and the landscaping vehicle

he was driving was registered to his employer. The stop was clearly pretextual, lacking any individualized basis to suspect Mr. Pineda of wrongdoing. The only reason for the stop and arrest was Mr. Pineda's identity, race, ethnicity, and national origin—an impermissible basis for any law enforcement action. The unlawful and discriminatory nature of Mr. Pineda's arrest supports a claim for false arrest.

110.    As a direct and proximate result of Defendant's actions, Mr. Pineda suffered physical, emotional, psychological, and financial damages.

## COUNT III

### Abuse of Process

### (FTCA, 28 U.S.C. §§ 2671–2680)

111.    Mr. Pineda repeats and realleges each of the preceding allegations as if fully set forth herein.

112.    Under Massachusetts law, the elements of abuse of process are: "(1) process was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage." *Datacomm Interface, Inc. v. Computerworld, Inc.*, 489 N.E.2d 185, 195 (Mass. 1986) (internal quotation marks and citation omitted) (affirming abuse of process claim).

113.    Defendant engaged in an abuse of process by issuing a baseless Notice to Appear ("NTA") and initiating removal proceedings against Mr. Pineda despite knowing that he was lawfully present in the United States. Defendant used that immigration process not for its intended purpose, but to retroactively justify, legitimize, or conceal Mr. Pineda's unlawful arrest and detention.

114. Rather than acknowledging their misconduct, the officials attempted to retroactively justify the unlawful arrest by issuing a legally improper NTA and initiating removal proceedings against Mr. Pineda.

115. Defendant used these processes for an improper purpose, including attempting to justify or legitimize Mr. Pineda's unlawful arrest and detention despite knowing that Mr. Pineda has a lawful immigration status.

116. As a direct and proximate result of Defendant's misuse of legal process, Mr. Pineda suffered physical, emotional, psychological, and financial damages.

## COUNT IV

### Assault

### (FTCA, 28 U.S.C. §§ 2671–2680)

117. Mr. Pineda repeats and realleges each of the preceding allegations as if fully set forth herein.

118. Under Massachusetts law, the elements of assault are: (1) the defendant acts intending to cause a harmful or offensive contact with another, or an imminent apprehension of such a contact, and (2) apprehension is created and experienced by the other person. *See, e.g.*, *Commonwealth v. Henson*, 259 N.E.2d 769, 773-74 (Mass. 1970) (affirming assault claim).

119. Defendant intentionally placed Mr. Pineda in reasonable apprehension of imminent harmful contact when ICE surrounded his vehicle with armed officers, falsely told him he had no rights, and ordered him out of the vehicle. As Mr. Pineda complied, the ICE officers moved into his immediate space at the driver's side door. In a "threat to the public peace and order," ICE officers positioned themselves to seize him, conveying an imminent intent to forcibly remove him from the vehicle. *Id.* at 774.

120.    Due to the ICE officers' physical presence, movements, commands, statements—and ICE's well-known use of excessive force in arresting Latino immigrants—Mr. Pineda reasonably believed that he was about to be subjected to immediate violence and physical harm.

121.    Mr. Pineda, in fact, experienced a reasonable and immediate fear of harmful physical contact at the hands of the ICE officers.

122.    As a direct and proximate result of Defendant's actions, Mr. Pineda suffered the injuries and damages described herein.

## COUNT V

## Battery

### (FTCA, 28 U.S.C. §§ 2671–2680)

123.    Mr. Pineda repeats and realleges each of the preceding allegations as if fully set forth herein.

124.    Under Massachusetts law, the elements of battery are: (1) the defendant acts intending to cause a harmful or offensive contact with another; and (2) the harmful or offensive contact with another person directly or indirectly results. *See, e.g.*, *Waters v. Blackshear*, 591 N.E.2d 184, 185 (Mass. 1992) (affirming battery claim).

125.    Defendant intentionally made harmful and offensive physical contact with Mr. Pineda when ICE agents forcibly grabbed him, pulled his arms behind his back, and applied handcuffs with excessive force. The handcuffs were applied so tightly that Mr. Pineda experienced significant pain and began to lose sensation in his hands.

126.    Defendant's use of force was not legally justified because Mr. Pineda was not resisting arrest—his hands were empty and visible at all times—and Defendant lacked any lawful authority to arrest him.

127. The physical contact was harmful and offensive and exceeded any permissible use of force.

128. As a direct and proximate result of Defendant's actions, Mr. Pineda suffered physical pain, injury, and damages.

## COUNT VI

### Intentional Infliction of Emotional Distress

### (FTCA, 28 U.S.C. §§ 2671–2680)

129. Mr. Pineda repeats and realleges each of the preceding allegations as if fully set forth herein.

130. Under Massachusetts law, the elements of intentional infliction of emotional distress ("IIED") are: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct," (2) "that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community,'" (3) "that the actions of the defendant were the cause of the plaintiff's distress," and (4) "that the emotional distress sustained by the plaintiff was 'severe.'" *Agis v. Howard Johnson Co.*, 355 N.E.2d 315, 318–19 (Mass. 1976) (citations omitted).

131. Conduct rises to the level of "extreme and outrageous" when it "go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Alianza Americas v. DeSantis*, 727 F. Supp. 3d at 65 (citation omitted).

132. Defendant intended to inflict emotional distress on Mr. Pineda, or at a minimum, knew or should have known that emotional distress was the likely result of their conduct.

133. Defendant's conduct was extreme and outrageous, including but not limited to: surrounding Mr. Pineda's vehicle with armed officers; falsely asserting that Mr. Pineda had no

rights; ordering him out of the vehicle without legal justification; forcibly restraining and handcuffing him; chaining his hands and legs; and confining him in overcrowded and degrading detention conditions for days without information as to when, or if, he would return to his family or be deported—all despite clear evidence of his lawful immigration status.

134.    Defendant's actions were undertaken in an abusive and intimidating manner and were motivated by racial profiling and discriminatory animus based on Mr. Pineda's actual or perceived identity, race, ethnicity, and/or national origin.

135.    Defendant's conduct goes beyond all possible bounds of decency and would be regarded as atrocious and utterly intolerable in a civilized community.

136.    Defendant's conduct caused Mr. Pineda severe emotional distress.

137.    As a result of Defendant's actions, Mr. Pineda suffered severe emotional distress, including but not limited to fear, anxiety, and humiliation.

138.    Mr. Pineda continues to experience the effects of this emotional distress, including sleep disturbances, nightmares, and ongoing anxiety.

## COUNT VII

### Negligent Infliction of Emotional Distress

### (FTCA, 28 U.S.C. §§ 2671–2680)

139.    Mr. Pineda repeats and realleges each of the preceding allegations as if fully set forth herein.

140.    Under Massachusetts law, the elements of negligent infliction of emotional distress ("NIED") are: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional

26

distress under the circumstances of the case." *Lanier v. President & Fellows of Harvard Coll.*, 191 N.E.3d 1063, 1072 (Mass. 2022) (citation omitted).

141. Defendant owed Mr. Pineda a duty to exercise reasonable care in conducting law enforcement operations. *See, e.g.*, 8 C.F.R. § 287.8 (standards for enforcement activities); *see also* PBNDS (standards for confinement conditions).

142. This duty of care was breached when, despite having actual knowledge that Mr. Pineda was lawfully present in the United States and did not pose a flight risk, the ICE officers unlawfully arrested and detained him.

143. Defendant's conduct caused Mr. Pineda to suffer emotional trauma.

144. Since the incident, he has exhibited ongoing, objectively verifiable symptoms consistent with those recognized in Massachusetts NIED case law—including recurring nightmares, increased emotional dysregulation, physical distress, exhaustion, and anxiety. *See Rodriguez v. Cambridge Hous. Auth.*, 823 N.E.2d 1249, 1254 (Mass. 2005) (concluding that based on similar injuries, plaintiff was entitled to recover for negligent infliction of emotional distress).

145. Any reasonable person in Mr. Pineda's position would have suffered emotional distress under the same traumatic circumstances.

**COUNT VIII**

**Conversion**

**(FTCA, 28 U.S.C. §§ 2671–2680)**

146. Mr. Pineda repeats and realleges each of the preceding allegations as if fully set forth herein.

147. Under Massachusetts law, "[t]he elements of conversion may be established by a showing that one person exercised dominion over the personal property of another, without right,

27

and thereby deprived the rightful owner of its use and enjoyment." *In re Hilson*, 863 N.E.2d 483, 491 (Mass. 2007) (citation omitted). "Money may be the subject of conversion." *Id.*

148.    Defendant seized Mr. Pineda's wallet and personal belongings during the search incident to his unlawful arrest.

149.    Defendant confiscated $600 in cash belonging to Mr. Pineda.

150.    Defendant never returned the $600 to Mr. Pineda upon his release or after his release.

151.    As a direct and proximate result of Defendant's actions, Mr. Pineda suffered financial losses and other damages.

## COUNT IX

### Negligent Supervision

### (FTCA, 28 U.S.C. §§ 2671–2680)

152.    Mr. Pineda repeats and realleges each of the preceding allegations as if fully set forth herein.

153.    Under Massachusetts law, to establish a claim of negligent supervision, a plaintiff must prove: "(1) that the persons whose actions form the basis of the claim were agents and/or employees of the defendant employer; (2) that the agents and employees came into contact with members of the public in the course of their employer's business; (3) that the employer failed to use reasonable care in the selection, supervision and retention of the agents and employees; and (4) that the failure to use such reasonable care was the proximate cause of harm to the plaintiffs." *Limone v. United States*, 497 F. Supp. 2d 143, 233 (D. Mass. 2007) (citations omitted), *aff'd on other grounds*, 579 F.3d 79 (1st Cir. 2009); *see also Rabelo v. Nasif*, No. WOCV201102329C, 2012 WL 6970543, at *1-2 (Mass. Super. Ct. Dec. 27, 2012).

154. At all relevant times, the ICE officers involved in the incident operated under the direction, supervision, and control of ICE supervisory personnel.

155. Numerous publicly documented incidents of ICE agents' conduct placed ICE supervisors on constructive notice of a widespread pattern of misconduct, yet they failed to take corrective action. *Supra* ¶¶ 63, 65.

156. At all relevant times, ICE supervisors negligently supervised the ICE officers involved in Mr. Pineda's encounter. ICE supervisors knew or should have known that failing to properly oversee these officers, enforce mandatory standards, or intervene to stop the unlawful conduct detailed above would foreseeably result in harm. Despite this knowledge, ICE supervisors allowed the misconduct to occur, thereby abandoning their supervisory responsibilities and permitting conduct that no supervisory discretion can lawfully sanction.

157. As courts in this district have recognized, it is not within the discretion of federal supervisors to ignore or permit illegal conduct by subordinates. *Limone*, 497 F. Supp. 2d at 232 (holding "it is not within the discretion of government supervisors to stand by and allow their employees to commit crimes").

158. By permitting this pattern of unlawful conduct to persist—despite notice of its foreseeability—and by failing to exercise even minimal supervisory control, ICE supervisors abandoned their supervisory responsibilities, conduct that falls outside any permissible range of supervisory discretion. *See, e.g.*, *Salem v. Stoneham Police Dep't*, 752 F. Supp. 3d 282, 299 (D. Mass. 2024).

159. As a direct and proximate result of this negligent and non-discretionary failure to supervise ICE officers, Mr. Pineda was caused to suffer and continues to suffer harm and damages, including, but not limited to, mental and emotional distress.

160.    Under the FTCA, the United States is liable for the acts or omissions taken by its agents, officials, and employees acting within the scope of their employment. Because the ICE officers were acting within the scope of their duties as federal officers, the United States is responsible for the damages Plaintiff sustained as a result of their conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Pineda respectfully requests that this Court:

A.    Enter judgment in favor of Plaintiff on Counts I-IX;

B.    Award compensatory damages in an amount to be proven at trial;

C.    Award Plaintiff's attorneys' fees and costs as allowable by law, including by the Equal Access to Justice Act, 28 U.S.C. § 2412; and

D.    Award any such other and further relief as the Court deems just and proper.

Dated: July 9, 2026

**JOSE PINEDA**

By his attorneys,

_/s/*Victoria Miranda*_____
Victoria Miranda (BBO# 695913)
vmiranda@lawyersforcivilrights.org
Mirian Albert (BBO# 710093)
malbert@lawyersforcivilrights.org
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
Tel: (617) 858-0282